UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CRAIG JOSEPH BAUM, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NANCY A. BERRYHILL, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 3:16-CV-325 JD |

## **OPINION AND ORDER**

On May 24, 2016, Plaintiff Craig Joseph Baum filed a *pro se* complaint in this Court seeking review of the final decision of the Defendant Commissioner of Social Security denying his application for social security disability benefits [DE 1]. The matter is fully briefed and ripe for decision [DE 12; DE 17; DE 22]. Because the ALJ's decision was supported by substantial evidence, the Court affirms the Commissioner's decision.

## **I. FACTS**

Baum filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") on June 19, 2014,[1] alleging an onset date of November 11, 2011, at which time he was 53 years old. Baum claimed disability on account of back pain, bilateral leg pain caused by varicose veins, diabetes, attention deficit disorder ("ADD"), and severe depression since age four. R. at 249-59. Baum blames his severe depression for his inability to

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

maintain relationships. Despite these problems, Baum reported that he regularly attends religious activities, cares for himself independently, performs chores at a regular pace (but can't rush), walks one to two miles, and spends a lot of time praying in the park. In the past decade, Baum has lacked insurance, had little to no income, and has been homeless. Prior to that, Baum worked for almost forty years and reported to doctors that he never sought treatment for his severe depression during that time. In fact, there are no medical records in the record predating July of 2014.

A. **Mental Health Records**

With respect to the medical records concerning Baum's mental limitations, the results of a July 2014 psychological consultative examination with Kent A. Hershberger, Ph.D., showed that Baum's grooming and hygiene were good, his mood was mildly depressed, and his affect was slightly restricted in range. R. at 320-35. His stream of thought was documented as "occasionally tangential" with some possible delusional/conspiratorial thoughts being present. However, Baum's attention and concentration were adequate and he was generally cooperative. Baum complained of extreme loneliness. But he also reported to being able to complete chores on a daily basis, such as sweeping and mopping, at the Center for the Homeless. Baum also indicated that he could cook for himself, do his own laundry, shop for groceries, and manage his own affairs. The examiner reported that Baum fostered some ideas that appeared "odd" and sometimes he had speech that was vague and rambling; however, the examiner further indicated that Baum did not appear to be overtly psychotic. The consultative examiner believed that the most appropriate diagnosis for Baum was personality disorder, not otherwise specified, with some depressive features, as well as some antisocial features and borderline tendencies. He

assigned Baum a Global Assessment of Functioning ("GAF") score of 50.[2] Ultimately, it was the examiner's opinion that Baum was oriented, knew what he was doing, and would be able to get along with co-workers and supervisors if he chose to do so. Moreover, he would be capable of taking directions from a supervisor and performing repetitive tasks that did not exacerbate his back pain.

After a referral from the Center for the Homeless, Baum underwent a psychological examination in January 2015 and an educational assessment in February 2015, by psychologist, Linda Monroe. R. at 392-403. Baum reported feeling socially isolated and being irritated by and having problems with others. The examiner reported that Baum's thought patterns were "quite tangential" and he shared some "very unusual beliefs which border on delusional" (such as, believing that he was one of the most gifted artists in the U.S. and displaying paranoid reactions to others). Despite noting that Baum had never been on any medications for mental health issues up through that time, the examiner diagnosed Baum with major recurrent depression with psychotic features and chronic post-traumatic stress disorder ("PTSD") with the need to rule out schizoaffective disorder. The plan included seeing if Baum's physician would prescribe antidepressants, which Baum was willing to try. Dr. Monroe opined that with proper treatment for depression, Baum might be able to work at least part-time.

---

[2] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Baum's assessment, GAF scores were still in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited September 17, 2017). A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).

A Kaufman Brief Intelligence Test revealed an average IQ composite score. Despite Baum's self-reported history of ADD, he had normal results on the Test of Variables of Attention ("TOVA"), a test of attentional functioning. He also scored in the normal range on the Attention Performance Index of the TOVA. Dr. Monroe noted problems with the validity of Baum's results on the Personality Assessment Inventory due to Baum's inconsistent responses, but she noted that his highest scores were for somatic symptoms, symptoms of possible psychosis, PTSD, and borderline personality disorder.

Baum's educational assessment revealed scores in the average range on the Verbal Comprehension Index, Perceptual Reasoning Index, Processing Speed Index, Full Scale IQ, and General Ability Index, and in the low average range on the Working Memory Index of the Wechsler Adult Intelligence Scale-Fourth Edition. Dr. Monroe concluded that Baum did not have any specific learning disability, but his reported history of ADD may have impacted his learning. Thus, she listed a diagnosis of ADD.

Given the recommendation for Baum to start antidepressants, Baum saw his primary care physician in early 2015 and reported being depressed. R. at 481-89. He was documented as being in a good general state of health with normal examine findings. He was given samples of viibryd for his depression. One month later, it was reported that Baum was feeling better with the medication, and he was given a refill for viibryd, which was increased at a subsequent appointment.

In May 2015, Baum began mental health treatment at Oaklawn Psychiatric Center. R. at 500-13. Baum reported that he felt depressed for most of his life, but he had never sought treatment or therapy. Baum mentioned that he had been denied disability twice and he was gathering information to support his appeal. It was documented that Baum's speech was well-

articulated, his thinking was logical and goal directed (although tangential), his affect was congruent but his mood was depressed, his insight and judgment seemed fair, his level of intelligence appeared to be average, and he denied any past or current suicidal thoughts. Baum received an initial diagnosis of major depression with a need to rule out psychotic disorder, and he was assigned a GAF score of 60.[3] It was recommended that he undergo outpatient group therapy and possibly individual therapy depending on the outcome of a psychiatric evaluation. His treatment records note that despite also being diagnosed with narcissistic personality disorder, he was doing well at the homeless shelter. After three sessions of therapy, it was documented that Baum was stable and wanted to continue his therapy.

**B. Physical Health Records**

With respect to the medical records concerning Baum's physical limitations, in August 2014, Baum underwent an internal medicine consultative examination with R. Gupta, M.D. R. at 327-33. Baum reported several longstanding issues, including a back injury in the 1970s and varicose veins since the 1990s. However, Baum had a normal gait, did not use a cane, and was able to stoop, squat, tandem walk, heel to toe walk, and stand from a seated position. Dr. Gupta reported normal exam findings, including negative straight leg raising test; full range of motion in the lumbar, cervical, and thoracic regions; and full strength in the upper extremities, along with full grip strength and normal coordination. It was noted that Baum's veins were noticeable on both calves which were marked by abnormal sensation; however, Baum appeared comfortable and was in no painful distress. Baum was supposed to wear support hosiery due to his varicose veins, but he reported being unable to afford them. It was Dr. Gupta's impression that Baum

---

[3] A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

5

suffered from current uncontrolled high blood pressure and a history of untreated and undiagnosed severe depression, with further history of ADD, lower back injury, and varicose veins.

An examination in September 2014 showed that Baum was in a good general state of health, including normal gait and balance. R. at 355-56. Despite normal exam findings, he was given referrals for his depression, back pain, and varicose veins in the event that he decided to seek follow-up care. A couple of weeks later, he reported "doing well" and his physical examination was normal. R. at 258-59. He was given samples of medicine for hypertension.

Baum underwent an orthopedic consultation in October 2014 due to complaints of back pain. R. at 334-36. The record indicated that Baum exercised regularly, twenty or more minutes, three or more times per week. Baum's physical examination was normal, including normal ranges of motion without edema and normal strength in the upper and lower extremities. While an x-ray of his back revealed normal alignment, it also showed degenerative changes and total loss of disk space height at S1. The orthopedic doctor simply told Baum to return as needed.

Baum also sought treatment in October for the pain, heaviness, and fatigue associated with his varicose veins. R. at 379. The record notes that Baum had previously been prescribed compression stockings many years ago, but he was unable to tolerate them. He was documented as having painful bilateral lower extremity varicose veins, which were to be further assessed with a venus duplex study.

In December 2014, Baum reported that he was "doing well." R. at 360-62. He was noted to be in a good general state of health, but he was diagnosed with diabetes and placed on metformin. Later that month, Baum sought treatment from his vascular doctor, Dr. Jeffrey Borders, for the pain caused by his varicose veins. R. at 371. Baum reported attempted use of

compression stockings and to now wanting surgical intervention. A venous duplex study showed no deep venous thrombosis ("DVT") (blood clots in the legs), but revealed severe bilateral greater saphenous vein reflux and bilateral small saphenous vein reflux. R. at 372. Thereafter, Baum underwent a radiofrequency endovenous closure of the left greater saphenous vein in February 2015 and of the right greater saphenous vein in March 2015. R. at 447-48, 465-66. Baum did well after the procedures and venous duplex studies continued to show no DVT and a successful closure of his veins. R. at 421, 427, 445, 462. In April 2015 Dr. Borders reported that Baum was doing very well clinically and a review of Baum's body systems showed negative results. R. at 431-32, 444. In July 2015, Baum reported that his legs felt much better and that the heaviness in his legs had completely resolved. R. at 414-17, 427. Baum told Dr. Borders that he was very happy with the outcome of the procedures. Physical examination showed that Baum's legs were unremarkable with no significant erythema or pitting edema. Baum was told to follow-up with the doctor in one year.

Baum also performed a stress test in the summer of 2015, which was interpreted as showing a normal myocardial perfusion study and a normal resting gated left ventricular ejection fraction and resting left ventricular wall motion. R. at 407-12. A follow-up for his diabetes in October 2015 indicated that Baum reported neck pain and achiness in his feet and ankles. Documented were a normal balance, gait, and physical exam findings. R. at 468-69. He was diagnosed with controlled hypertension (for which he was to continue his medication), uncontrolled diabetes (for which he was to increase his metformin), and depression (for which he was to continue counseling).

On December 7, 2015, Baum reported to the emergency room with complaints of cough, shortness of breath, wheezing, congestion, and rhinorrhea. R. at 495-99. On examination, he was

reported as having normal ranges of motion and strength. He was alert, cooperative, and displayed an appropriate mood and affect. His chest x-ray was negative for acute pulmonary disease process. He was diagnosed and treated for acute bronchitis and told to follow-up with his primary care physician.

Baum next presented for a follow-up on his diabetes in February 2016. He denied blurred vision and numbness or tingling in his feet, but reported feeling fatigued and experiencing achiness in his ankles. R. at 515-16. He was given additional prescriptions for his diabetes and told to come back in one month for a checkup on his diabetes.

### C. Reviewing State Agent Opinions

State agent consultative examiners assessed the type of work that Baum was capable of performing both physically and mentally at the initial level on August 19, 2014, and at the reconsideration level on January 7, 2015. R. at 75-96, 99-122. They assessed that Baum suffered from a personality disorder with borderline and antisocial features, and from degenerative back disorder. The state agents opined that given his complaints, reported daily activities, and treatment record, Baum could perform medium work (lifting/carrying fifty pounds occasionally and twenty-five pounds frequently with six hours of standing, walking, and sitting in a workday), but he had to avoid concentrated exposure to wetness, hazards, and unprotected heights. He also retained the ability to carry out unskilled, simple tasks and manage the stresses of work that involved superficial contact with co-workers and supervisors. It was their belief that this type of work accommodated Baum's moderate limitations in understanding and remembering detailed instructions and maintaining attention/concentration, and mild difficulties with activities of daily living and maintaining social functioning.

**D. Testimony Before the ALJ**

Baum's applications were denied initially on August 25, 2014, and were then denied on reconsideration on January 7, 2015. On February 17, 2016, a hearing was held before Administrative Law Judge Howard Kaufman ("ALJ"). During the hearing, testimony was received from vocational expert, Richard Riedel ("VE"), and the claimant, who was represented by an attorney.

Baum provided testimony concerning his version of the nature and extent of his limitations as caused by his back and neck pain, varicose veins, ADD, depression, diabetes, and lung problems. R. at 28-64. Baum believed that he has suffered from depression since he was four years old. Despite these conditions, being placed on viibryd was the first thing he'd ever done to combat the depression. It was also his belief that he'd suffered from lower back pain for over forty years. Yet, he testified that back in 2012, he would have continued working as a security guard, had it not been seasonal employment. In addition, he reported to still being able to clean floors and take out the garbage at his shelter. He did not work in the shelter's kitchen because that job would require him to work until he fell over. Baum testified to having two to four lung infections per year, over the course of his entire lifetime, which were apparently brought on by below freezing temperatures and required extensive recoveries thereafter. He also explained how he has difficulty getting along with others, how he doesn't get treated fairly, and how he has been made to feel like his opinion does not matter. Baum testified about his distrust in society's laws, his feeling of having lost his "inner resolve," and his belief that his diabetes and vein problems would likely kill him. Despite his physical problems, Baum still believed that

he could walk for one mile without a break, but he preferred not to lift anything over twenty pounds.

The VE testified that based strictly on the (relevant) hypothetical posed to him (which offered an assigned residual functional capacity ("RFC")[4] of medium work, limited to simple, repetitive, routine tasks with no production rate pace, but with the ability to meet end of the day goals that did not involve strict quota requirements, limited by only brief, superficial contact with coworkers and supervisors and with some environmental limitations), Baum would be unable to perform his past semi-skilled work. However, the VE testified that Baum would be able to perform other work in the economy, such as work as a laundry laborer, industrial cleaner (such as, pushing a broom in a factory), and automobile detailer.

The ALJ issued a decision on March 7, 2016, denying Baum disability benefits and concluding that Baum was not disabled under the Social Security Act because he was able to perform other work in the national economy (step 5). The Appeals Council then denied Baum's request for review on April 1, 2016, making the ALJ's decision the final determination of the Commissioner. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Baum seeks review of the Commissioner's decision, thereby invoking this Court's jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. STANDARD OF REVIEW

This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might

---

[4] Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545.

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to the ALJ's findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III. DISCUSSION

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations

create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

    1. Whether the claimant is currently engaged in substantial gainful activity;

    2. Whether the claimant has a medically severe impairment;

    3. Whether the claimant's impairment meets or equals one listed in the regulations;

    4. Whether the claimant can still perform relevant past work; and

    5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, then in between steps three and four, the ALJ must assess the claimant's residual functional capacity, which, in turn, is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Without citation to record evidence, Baum contends that the ALJ failed to supply substantial evidence to support Baum's not having further limitations [DE 1; DE 12; DE 22].[5]

---

[5] Baum's complaint alleges that depression is his primary illness [DE 1]; his opening statement summarily claims that the ALJ failed to supply substantial evidence to support Baum's not being

12

Broadly construing Baum's *pro se* claim, the Court considers the issue to be whether the ALJ adequately considered the evidence and explained the limitations placed in the RFC determination relative to Baum's mental and physical problems. Because the Court concludes that the ALJ did, the opinion must be affirmed.

## IV. ANALYSIS

### A. RFC

In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, including testimony by the claimant, as well as evidence regarding limitations that are not severe. *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski*, 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

---

disabled on account of his depression and personality disorder [DE 12]; and, his reply brief makes general claims of disability based on both physical and mental problems [DE 22]. However, Baum never provided "arguments supported by legal authority and citations to the record," which he was required to do, even as a *pro se* litigant. *Cadenhead v. Astrue*, 410 F. App'x 982, 994 (7th Cir. 2011). Thus, his generalized assertion concerning the ALJ's failure to adequately consider his limitations is not sufficient to challenge the adverse ruling. *Id*. Despite Baum's waiver of his argument of error, *see, id*. (citing *Long v. Teachers' Ret. Sys. of State of Ill*., 585 F.3d 344, 349 (7th Cir. 2009); *Jones v. InfoCure Corp*., 310 F.3d 529, 534 (7th Cir. 2002)), the Court still considers whether the ALJ adequately assessed the record with respect to Baum's mental and physical problems.

13

In this case, the Court agrees with the Commissioner that the ALJ conducted a thorough analysis of the record and reasonably determined that Baum was not disabled. In determining that Baum retained the capacity to perform a limited range of unskilled medium work with no quota requirements, the ALJ assessed Baum's RFC by evaluating the objective medical evidence, the medical source opinion evidence, and the credibility of Baum's allegations of disabling symptoms. The ALJ also reasonably found that, based on the VE's testimony, a significant number of jobs in the national economy accommodated the stated functional restrictions and Baum's vocational profile of age, education, and work experience.

More specifically, it appears that the ALJ thoroughly discussed the relevant medical evidence and did not focus exclusively on evidence that favored his decision that Baum was not disabled. As an initial matter, the ALJ noted that although Baum alleged disability beginning in 2011, the earliest medical records he submitted were from 2014. While it is true that Baum has had limited resources for seeking medical care in the last decade, the ALJ considered this fact by noting Baum's limited financial means, lack of insurance, and state of homelessness. Moreover, the ALJ noted that Baum has never regularly sought treatment for his mental or physical impairments, despite allegations that some of them, including his severe depression and back pain, apparently existed ever since he was very young. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.").

Moreover, the ALJ explained that even after Baum obtained access to medical care in 2014, his treatment records were not indicative of the disabling conditions he claimed. The ALJ specifically identified and considered the details of the medical records in the file.

14

With respect to Baum's physical limitations, the ALJ reviewed the details of Baum's consultative examination by Dr. Gupta in August 2014 and noted that despite a history of reported back injury and varicose veins, some tenderness of the lumbar spine, slightly reduced strength in the lower extremities, and an x-ray revealing degenerative disc disease, Baum's exam findings were mostly normal. The ALJ also considered records from treating sources revealing that in late 2014 Baum was in a good general state of health, including normal gait and balance. During the orthopedic consultation, Baum was reported as exercising regularly several times per week and the ALJ noted that despite Baum's documented degenerative disc disease, Baum's exam findings were normal and no surgery was recommended. The ALJ explained that Baum's complaints with respect to his back issues were not significant in late 2015, nor were there significant objective findings in the record—all of which is true. The ALJ further documented Baum's more recent diagnoses and treatment for diabetes, hypertension, lung disease, and dyspnea. While the ALJ determined that these were non-severe impairments, the ALJ recognized the need to consider them (and all symptoms) in formulating the RFC. Finally, the ALJ discussed the evidence pertaining to Baum's painful varicose veins. The ALJ documented Baum's successful treatment with a vascular doctor. The ALJ also relied on Baum's expressed satisfaction with the outcome of his vein surgeries, despite Baum's more recent complaints of fatigue and aching caused by his varicose veins.

With respect to Baum's mental health problems, the ALJ reasonably considered the medical evidence regarding Baum's treatment. The ALJ thoroughly detailed the results of the July 2014 psychological consultative examination; the January 2015 psychological examination; the February 2015 educational assessment; along with, Baum's mental health treatment with his primary care physician and follow-up treatment with Oaklawn Psychiatric Center in May 2015.

The ALJ properly documented the findings (both good and bad) of those examinations and records, explicitly considered all of Baum's diagnosed mental illnesses, and even referred to both GAF scores of record. The ALJ further explained that more recently, Baum was reported as improving and doing well, once he started taking medication.

In considering the opinions of sources who were not treating physicians, the ALJ properly applied the factors listed in 20 C.F.R. § 404.1527(c) to determine how much weight to give them. Here, the ALJ provided a detailed explanation, which tracked the regulatory factors, for giving great weight to the opinions of the state agency consultants. The ALJ found that the opinions were consistent with and supported by the evidence. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

With respect to the opinions concerning physical limitations, the ALJ considered that the state agent opinions were consistent with the "overall evidence showing some degenerative changes in [Baum's] cervical and lumbar spine, but very conservative treatment with no surgical intervention." Moreover, the ALJ found that the opinions were supported by specific clinical findings, such as negative straight leg raising test, negative Romberg sign, and generally intact strength. After Baum's surgeries on his veins, Baum no longer reported numbness or tingling issues. The ALJ also considered the fact that even Baum's son reported that Baum was constantly cleaning and was able to walk, drive, and tend to his personal needs, despite some problems with concentration and dealing with others. Finally, in giving great weight to the state agency opinions and in assessing Baum's RFC, the ALJ also noted that no doctor opined that

Baum had limitations in standing, walking, or sitting due to physical impairments. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005) (affirming the residual functional capacity finding where two non-examining physicians "opined that [the claimant] could meet the requirements of light work . . . and no doctor ever suggested that any greater limitation was required"). And despite the limited records supporting Baum's physical limitations, the ALJ explicitly placed postural and environmental restrictions in the RFC to account for the limits that the ALJ credited as being caused by Baum's back injury and varicose veins.

The ALJ also sufficiently explained his reasons for giving great weight to the opinions of the state agent psychological consultants. 20 C.F.R. § 404.1527(c). Similar to these state agent opinions, the ALJ concluded that Baum could perform simple, repetitive, routine tasks with no production rate pace and no strict quota requirements, but he could meet end of the day goals and handle brief/superficial contact with coworkers and supervisors. The ALJ explained that this determination was also supported by the psychological consultative examiner's opinion that Baum had fairly good social skills and that he could get along with others and follow supervisor direction, if he chose to do so. The ALJ noted that despite Baum's positive mental status examination findings, Baum continued to have some interaction with others, and he regularly and independently cared for himself and completed chores. The ALJ further supported his opinion with the fact that Baum's recent mental health treatment showed an improvement in his symptoms with medication and therapy. All of these reasons were explicitly provided by the ALJ and sufficiently support the ALJ's adoption of the state agent opinions, and rejection of Dr. Monroe's (non-treating physician) opinion that mental health treatment would only result in Baum's ability to withstand part-time work. *See, e.g., Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (noting that the ALJ's decision will be upheld where there exists "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion"). Moreover, the ALJ explicitly explained that the RFC accounted for the mental limitations that the ALJ credited, by limiting Baum to simple work with limited production requirements and limited interaction with coworkers and supervisors.

In this case, the ALJ provided an adequate discussion of the record in weighing the medical opinions and discrediting Baum's exaggerated complaints of disabling conditions given the lack of evidence to support his claims. *See Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."). To reverse this ALJ's opinion would essentially require the Court to reweigh the evidence and decide questions of credibility, which it cannot do. *Lopez*, 336 F.3d at 539. Ultimately, the ALJ's RFC determination is affirmed because it is supported by substantial evidence.

### B. Step 5

Because the RFC determination was supported by substantial evidence, the Court is able to rely on the ALJ's determination that Baum is capable of performing other work (step 5). More accurately stated, in deciding what work Baum was capable of performing, the ALJ relied on the VE's testimony, which in turn, relied on the ALJ's hypothetical question that incorporated the adequately supported RFC determination.

There is nothing to suggest that the ALJ failed to incorporate into the hypotheticals those impairments and limitations that the ALJ accepted as credible, *see Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007), nor that the VE's testimony was somehow inconsistent with the Dictionary of Occupational Titles, *see Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).

Accordingly, the VE's testimony can be relied upon as an accurate indicator for the type of work that Baum is capable of performing. *See Young*, 362 F.3d at 1003-05; SSR 96-8p. And because it was determined that Baum could perform work that existed in significant numbers in the national economy, the ALJ substantially supported his decision in denying disability benefits to Baum.

## V.  CONCLUSION

The Court finds that the Commissioner's decision was supported by substantial evidence and was adequately reasoned, so the Court AFFIRMS the Commissioner's denial of Baum's claim for disability benefits. The Clerk is DIRECTED to enter judgment in favor of the Commissioner.

SO ORDERED.

ENTERED:  September 19, 2017

> /s/ JON E. DEGUILIO
> Judge
> United States District Court